**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

|  |  |  |
|---|---|---|
| JEM ACCESSORIES, INC., d/b/a Xtreme Cables, | : : : | **Civil Action No. 17-11899 (SRC)** |
|  | : : | **OPINION** |
| Plaintiff, | : : |  |
| v. | : : |  |
| THE MICHAELS COMPANIES, INC., | : : |  |
| Defendant. | : : |  |

**CHESLER**, District Judge

This matter comes before the Court on the parties' cross-motions for summary judgment. The Court has reviewed the papers and proceeds to rule on the motions without oral argument, pursuant to Federal Rule of Civil Procedure 78. For the reasons that follow, Plaintiff's motion for summary judgment will be denied, and Defendant's motion for summary judgment will be granted in part and denied in part.

## I.    BACKGROUND

Plaintiff Jem Accessories, d/b/a Xtreme Cables ("Plaintiff" or "Jem"), based in Edison, New Jersey, is engaged in the business of purchasing electronic accessories and other items from manufacturers and then selling that inventory to retail businesses. Defendant The Michaels Companies ("Defendant" or "Michaels") is a national retailer of arts and crafts supplies, home décor, do-it-yourself products and sundry similar merchandise. It also sells toys and seasonal items. This breach of contract action arises out of the dealings between Jem and Michaels

1

concerning the sale of items known as "fidget spinners" during the 2017 spinner craze.[1] Broadly summarized, Jem, the seller, claims that Michaels improperly canceled purchase orders for a certain quantity of fidget spinners and also claims that Michaels failed to honor its promise to purchase another quantity. The following synopsis sets forth the facts relevant to this motion for summary judgment.

**A. Jem and Michaels Enter into a Vendor Agreement**

In 2017, Jem decided to source and re-sell fidget spinners, in an attempt to profit from the fidget spinner fad. In connection with these efforts, Jem hired Clint O'Rear as a sales representative authorized to engage in discussions with Michaels and broker sales of fidget spinners from Jem to Michaels. O'Rear first approached Michaels in April 2017 about a potential sale of spinners. Consistent with its business practices, Michaels required Jem to agree to various contracts before it would order any product from Jem.

Among the documents a potential supplier must sign to become an "Authorized Vendor" of Michaels is the Vendor Agreement. The Vendor Agreement comprises various subsumed agreements dealing with a host of issues pertaining to potential purchases of merchandise by Michaels from suppliers. The terms and conditions set by the Vendor Agreement apply to all purchase orders, unless modified in accordance with the Vendor Agreement. Michaels sent Jem the Vendor Agreement on April 5, 2017 for Jem's review and consideration. It is undisputed that

---

[1] "Fidget spinners" or, simply "spinners" are gadgets made of plastic or metal and consisting of a multi-lobed flat structure with a ball-bearing center. Their design allows a person to hold the center while the paddle-shaped lobes spin along the axis with little effort, hence the name "spinner." Fidget spinners experienced a meteoric rise and then abrupt fall in popularity in 2017. In other words, they were a fad. Fidget spinners were particularly popular among children and thus generally regarded as toys. For visual appeal, the spinners came in various colors and designs.

both Jem and Michaels executed the Vendor Agreement, on April 7, 2017 and May 10, 2017, respectively.

The Vendor Agreement contains, in relevant part, three provisions on which Michaels bases its motion for summary judgment: two regarding the cancellability of a purchase order and the other regarding modification of a purchase order's terms and conditions. The Vendor Agreement provides as follows:

> 10. Michaels and Vendor recognized [sic] that the "Do Not Ship Before" date specified on the front of this purchase order is an essential part of this agreement . . . [A] purchase order shall automatically be canceled with respect to all goods not shipped on or before the "Cancel If Not Shipped By" date specified on the front of this purchase order, in the absence of express written instructions from Michaels to the contrary.

> \* \* \*

> 17. Michaels reserves the absolute right to cancel this order in whole or in part for any reason before shipment of the goods ordered thereunder.

> 18. None of the terms and conditions contained in this purchase order may be added to, modified, superseded or otherwise altered except by a written instrument signed by an authorized representative of Michaels and delivered by Michaels to Vendor . . ..

(Resnick Cert. Ex. 6.)

The Vendor Agreement also includes an Electronic Data Interchange Trading Partner Agreement ("EDI Agreement") and a Product Testing agreement. The EDI Agreement sets up a system for the electronic transmission of orders, in place of traditional paper-copy purchase orders. Referring expressly to an attached a copy of the standard form of purchase order used by Michaels, the EDI Agreement states that "[a]ny future purchases by Michaels from Trading Partner of any good or services shall be on the terms and conditions contained on the front and back of Purchase Order (and such other terms and conditions as specified by Michaels in

connection with specific orders), regardless of the form in which Michaels submits its orders (whether by Purchase Order, electronic data interchange or otherwise)." (Id.). The Product Testing agreement requires all products purchased by Michaels pursuant to the Vendor Agreement to comply with Michaels test protocols and standards, as documented by an approved lab, prior to shipping.

Additionally, of relevance to the claims at issue, the Vendor Agreement contains a choice of law provision, stating that the agreement "shall be construed in accordance with the laws of the state of Texas without regard to conflicts of laws." (Id.)[2]

## B. Michaels Orders Fidget Spinners from Jem

After back-and-forth communications between Jem and Michaels regarding product availability and Michaels' interest in Jem's spinner styles, Jem made an offer of sale on May 10, 2017. On that date, Jem (through sales representative O'Rear) emailed Michaels a spreadsheet showing the various spinner products and quantities that Jem could supply. The parties discussed this offer, including Jem's wish to shorten the 90-day payment term set forth in the Vendor Agreement due to the financial pressure of sourcing the high-demand products on an expedited basis. Additionally, in the discussions, O'Rear stated that, in order to move forward with the sale, Jem required "Written confirmation in the email that the qty's are firm and that Michaels will provide non-cancellable PO's for the qty's on the spreadsheet you sent me. We need to receive

_____

[2] Jem and Michaels agree that Texas law applies to this action and have briefed their motions accordingly. This Court, which sits in diversity, must "look to the choice-of-law rules of the forum state – the state in which the District Court sits – in order to decide which body of substantive law to apply to a contract provision, even where the contract contains a choice-of-law clause." Collins v. Mary Kay, Inc., 874 F.3d 176, 182 (3d Cir. 2017). New Jersey rules provide that "ordinarily, when parties to a contract have agreed to be governed by the laws of a particular state," that contractual choice will be upheld. Id. at 183-84 (quoting Instructional Sys., Inc. v. Computer Curriculum Corp., 130 N.J. 324, 341 (1992)). This Court will therefore apply Texas law in its analysis of the claims at issue in this suit.

non-cancellable POs . . . by next week." (Resnick Cert. Ex. 17.) Pam Merritt, a buyer for Michaels' toy division, responded in an email as follows: "60 day terms approved. Now get me some units!!!!!" (Resnick Ex. 15.) Michaels did not issue purchase orders at this point. There is also no dispute that, at this point, Michaels did not provide a written commitment to purchase a specific quantity of fidget spinners set forth in the May 10 offer. Jem, however, does contend that Merritt indicated in phone calls that Michaels would purchase all the spinners Jem could supply.

Two days later, Jem and Michaels struck a deal. On May 12, 2017, the parties traded various emails. In an email time-stamped 1:24 p.m., O'Rear sent Jem's revised offer of sale to various individuals at Michaels, including Merritt and her associate Candace Lewis. O'Rear's email attached a spreadsheet breaking the spinners down into three categories—Solid, Print and LED—and setting forth the quantities of each being offered for sale, with an overall total of approximately 2.3 million units. Additionally, O'Rear's email stated that a quick response from Michaels was required, with a commitment to the quantities offered and a statement that Michaels understands that the purchase orders must be non-cancellable. The email states:

> If you don't [sic] see any issues with these qty's, Pam [Merritt] can just send this back to me and say that Michaels is committing to these qty's as firm qty's and understands qty's cannot change on PO's and that PO's must be non-cancellable. Then we've got to get PO's to them by next week. Item setup coming shortly.

(Resnick Cert. Ex. 19.) Following some intermediate communications in which O'Rear sought Michaels' response to the offer, a commitment to purchase was made in an email from Lewis to O'Rear. The email stated as follows:

> Clint, as of right now, we would like to take all of the LED units. Which should come out to 610,080 units across 5 weeks.
>
> Please take this as a commitment from us. Since it is 5:45 now, we will have orders to you first thing next week.

(Resnick Cert. Ex. 22.)

No mention was made in this email, or any other email from Michaels in response to Jem's May 12 offer, of Jem's requirement that the purchase orders for the spinners be non-cancellable, contrary to the terms of the Vendor Agreement. Further emails from Michaels were also silent as to the portion of Jem's offer pertaining to the Solid and Print spinners. Indeed, after Lewis expressed Michaels' commitment to 610,080 units of LED spinners, O'Rear wrote back for clarification, as follows: "Thanks Candace. So just to confirm – you do not want any of the Print or Solid inventory for this 5 week period?" (Resnick Cert. Ex. 23.) Minutes later, Merritt, who had been copied on this entire chain of May 12 emails, wrote to O'Rear, stating that she will continue to discuss orders for other quantities with her supervisors but making clear that "currently this is all we have financial approval on to write." (Id.) O'Rear acknowledged Merritt's message, indicating his understanding that the agreement made by Michaels was limited to the quantity of LED spinners set forth in the Lewis email. His email to Merritt of 6:34 p.m. on May 12, 2017 stated:

I was just told that Xtreme [Jem] went ahead and cut PO's for the qty's they provided for availability, because they thought you would be wanting to pull in at least that many. Not your problem – that was a risky move on their part, but one made in an effort to be proactive on timelines and availability.

SO, what that means is that what I really need to know Monday is if you find out for sure you are NOT moving forward on any of those other qty's. They won't have any problem selling them, but they made the purchase to try to cover your needs and hit your timelines and they have those qty's allocated in their system under your account right now.

Let's just keep working through it Monday.

(Resnick Cert. Ex. 23.)

The following week, Michaels generated various purchase orders for the 610,080 LED spinners, for a purchase from Jem totaling $1,586,208. It sent copies of the purchase orders to Jem by email addressed to O'Rear on May 17, 2017, informing him that the orders would be placed that day via the EDI system. The Court will refer to these purchase orders as the "May 17 Purchase Orders."

None of the May 17 Purchase Orders stated that the order was non-cancellable. To the contrary, the front of each document expressly stated, as to the quantity set forth therein, "Do not Ship Before: [date]" and "Cancel if Not Shipped by: [date]" (Resnick Cert. Ex. 25.) The shipping windows for the quantities ordered in the May 17 Purchase Orders range from an earliest window of May 29, 2017 to June 2, 2017 to a latest window of June 26, 2017 to June 30, 2017.

No purchase orders for any additional quantities or other styles of spinners (Solid and/or Print) were issued by Michaels to Jem.

**C. Michaels Questions Jem's Compliance with Product Safety Testing**

Before the spinner orders could ship, Jem had to furnish Michaels with proof that the products complied with applicable testing protocols, as set forth in the Vendor Agreement. Previously, during the parties' negotiations concerning the fidget spinner purchase, Michaels had provided O'Rear with its testing protocols for toys. On May 12, 2017 O'Rear forwarded the protocols to the principals at Jem, informing them that Michaels wanted the spinners tested according to toy safety protocols "since intended use is as a toy." (Resnick Cert. Ex. 66.) O'Rear then volunteered that if the items did not comply with toy safety testing "we can work with them [Michaels] on waivers and exemptions for specific failures." (Id.)

On May 26, 2017, O'Rear emailed Michaels, sending an "updated test report" for Jem's LED spinners and stating that "everything passed" for the standard applicable to toys for "age grade 3+." (Resnick Cert. Ex. 26.) The record does not show any further communication at this point between Michaels and Jem concerning the testing requirements as a pre-condition to shipment. Then, almost three weeks later, on June 15 at 7:20 a.m., Michaels sent Jem an email with the subject line "URGENT – DO NOT SHIP." (Leming Cert. Ex. R.) In that email, Michaels advised Jem that the LED spinners were "not compliant with Michaels product quality/compliance requirements . . .." (Id.)[3]

The test report Jem submitted to Michaels on May 26 to demonstrate compliance with safety standards has not been proffered by either Plaintiff or Defendant with their respective motions for summary judgment. The Court gathers, based on emails in the record, that the report

---

[3] Later that same day (June 15, 2017 at 10:24 p.m.), an email circulated internally at Michaels, sent from address "productcompliance," listed the Jem May 17 Purchase Orders and stated: "The quality/compliance hold on shipments of the following items/orders has been released." (Resnick Ex. 39.) Michaels offers no explanation for the apparent inconsistency of information.

cited an outdated battery safety standard. When notified of this issue, Jem took the position that the battery standard in question was not applicable to the LED spinners because, one, the items did not contain rechargeable or replaceable batteries and two, the product was not, in Jem's view, a toy. Moreover, according to Jem, as soon as the lab was notified of its error, it prepared a revised, corrected report. The revised testing report was sent to Michaels on Friday, June 30, 2017. On Monday, July 3, 2017, Michaels informed Jem that the product referenced in the "urgent – do not ship" email of June 15 had been released from "do not ship" status.

### D. Michaels Experiences Inventory Issues and Cancels Jem's Purchase Orders

At about the same time that this safety compliance issue arose, indeed just three days before Michaels raised the battery standard issue with Jem, Michaels advised Jem that it needed Jem to hold shipment on the LED spinners because Michaels was "working on balancing our inventory flow on fidget spinners." (Resnick Cert. Ex. 31.) The record contains a number of emails, demonstrating that by mid-June 2017, Michaels was experiencing a slow-down in moving its existing inventory of fidget spinners. On June 13, Merritt emailed various people, including O'Rear, as follows: "The inventory team has asked us to hold on shipping temporarily. Vendor has not routed at our request." (Resnick Cert. Ex. 33.) When asked by O'Rear if Jem would get clearance to route the product "tomorrow" (June 14), Merritt responded, "No our inventory team has asked to hold through next week and we will revisit then." (Id.) Then, on June 14, an internal email written by Merritt to her associates concerning purchase orders for spinners, including the Jem orders, stated: "Team – Our executive team has asked us to delay pickup from the following open POs on fidget spinners due to a large influx of inventory last

week. Please do not route any of the following POs, and also if possible, please note in the system not to charge back for late routing." (Resnick Cert. Ex. 37.) O'Rear and Merritt continued to communicate over the next couple of days, with O'Rear pressing for information on when Michaels would start accepting shipments from Jem.

In the meantime, throughout the month of June, the shipping windows set forth in the May 17 Purchase Orders were closing. Michaels points out that the "cancel by" date as to more than half of the units passed without fulfillment of the orders by Jem. Additionally, Michaels asserts that on June 19, it expressly canceled the orders with upcoming shipping widows, representing approximately 50% of the originally ordered units, in an exercise of its contractual right to cancel prior to shipment. Merritt communicated this cancellation to O'Rear by telephone and then sent a confirming email:

> Per our phone call, the final update is that we need to cancel the units that were supposed to ship this week and next. The balance of the units we will need to flow in over the next several weeks.
>
> This makes me sick to relay this info to you. I feel like my integrity is at stake. The same people who were pushing me to rush these in are now asking me to cancel PO's. And, you are not the only vendor getting this news. I'm very sorry.

(Resnick Cert. Ex. 42.)

The June 19 cancellation prompted follow-up discussions between Jem and Michaels. O'Rear's June 20, 2019 email to Merritt and others at Michaels stated that they [Michaels] "talk[ed] through the spinner situation with us [Jem] this morning," and set forth his understanding that Michaels "agree[d] to take the first 3 POs with a total of 310,080 units." (Leming Cert. Ex. T.) He also asked for confirmation from Michaels as to the status of the pending orders as well as an updated shipping schedule. (Id.) On June 29, 2017, Michaels sent Jem an email advising that some of the May 17 Purchase Orders were being updated to reflect

new shipping windows, whereas others had been canceled by Michaels. (Leming Cert. Ex. U.) The canceled purchase orders corresponded to approximately 300,000 units of the original quantity of LED spinners ordered from Jem. The remaining quantity, approximately 310,000 units, was covered by purchase orders with modified shipping windows, which the Court will refer to as the "June 29 Purchase Orders" for clarity.

The June 29 Purchase Orders called for shipment between July 27 and August 2, 2017. Before the new shipping window arrived, however, the bottom fell out of the fidget spinner craze. Demand for the spinners declined abruptly, and Michaels found that its inventory was not selling as expected. Michaels decided that, in light of the sitting inventory, it could not accept additional shipments of spinners. On July 25, 2017, Michaels canceled the June 29 Purchase Orders with Jem.

### E. Jem Files the Instant Lawsuit Against Michaels

Jem initiated this legal action against Michaels on or about November 21, 2017, asserting four claims for relief. Jem seeks to recover for losses associated with all three types of fidget spinners Jem claims Michaels purchased or promised to buy, totaling approximately 2.3 million units of merchandise and almost $6 million in allegedly lost sales. In Count One, Jem pleads a breach of contract claim as to the LED spinners for which purchase orders were created. Count Two asserts a claim for breach of the covenant of good faith and fair dealing. Count Three pleads an estoppel claim which alleges that Michaels is estopped asserting that it had the right to cancel the purchase orders issued to Jem. Count Four pleads a separate estoppel claim, alleging that Jem sent Michaels a spreadsheet of available spinners and that Michaels "knew, or should have

known, that [Jem] would rely upon defendant's silence in accepting the spreadsheet as confirmation that these quantity of spinners would ultimately be purchased from plaintiff by defendant for the cost set forth in the spreadsheet." (Compl., ¶ 83.)

All four claims arise under state law. The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a).

## II.   DISCUSSION

### A.  Legal Standard

Federal Rule of Civil Procedure 56(a) sets the standard the Court must apply to the parties' cross-motions for summary judgment. Rule 56(a) provides that a "court shall grant summary judgment if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986) (construing the similarly worded Rule 56(c), predecessor to the current summary judgment standard set forth in Rule 56(a)). It is well-established that a factual dispute is genuine if a reasonable jury could return a verdict for the non-movant and material if, under the substantive law, the dispute would affect the outcome of the suit. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In considering a motion for summary judgment, a district court "must view the evidence 'in the light most favorable to the opposing party.'" Tolan v. Cotton, 134 S. Ct. 1861, 1866 (2014) (quoting Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970)). It may not make credibility determinations or engage in any weighing of the evidence. Anderson, 477 U.S. at 255; see also Marino v. Indus. Crating Co., 358 F.3d 241, 247 (3d Cir. 2004) (holding same).

Once the moving party has satisfied its initial burden, the nonmoving party must establish the existence of a genuine issue as to a material fact in order to defeat the motion. Jersey Cent.

Power & Light Co. v. Lacey Twp., 772 F.2d 1103, 1109 (3d Cir. 1985). To create a genuine issue of material fact, the nonmoving party must come forward with sufficient evidence to allow a jury to find in its favor at trial. Gleason v. Norwest Mortg., Inc., 243 F.3d 130, 138 (3d Cir. 2001), overruled on other grounds by Ray Haluch Gravel Co. v. Cent. Pension Fund of the Int'l Union of Operating Eng'rs and Participating Emp'rs, 134 S. Ct. 773 (2014). The party opposing a motion for summary judgment cannot rest on mere allegations; instead, it must present actual evidence that creates a genuine issue as to a material fact for trial. Anderson, 477 U.S. at 248; see also Schoch v. First Fid. Bancorporation, 912 F.2d 654, 657 (3d Cir. 1990) (holding that "unsupported allegations in [a] memorandum and pleadings are insufficient to repel summary judgment").

## B.  Analysis

At the outset, the Court notes that there are numerous key facts not in dispute in this case. First, Jem and Michaels admit that they validly entered into, and are bound by, the Vendor Agreement. Second, they agree that, consistent with the Vendor Agreement's choice of law provision, the law of the State of Texas applies to the claims at issue. Third, both parties acknowledge that, of the approximately 2.3 million fidget spinner units presented to Michaels as available for sale by Jem, purchase orders were created for only 610,080 units of LED spinners. Finally, there is no dispute that Jem did not ship any fidget spinners to Michaels.

In light of the foregoing, the Court finds that Defendant Michaels has demonstrated that it is entitled to summary judgment on Counts Two through Four of the Complaint.

Jem bases its claim for breach of the covenant of good faith and fair dealing (Count Two) on the Texas Uniform Commercial Code ("UCC"). Specifically, in section 1.304, the Texas UCC provides: "Every contract or duty within this title imposes an obligation of good faith in its

performance and enforcement.".[4] Tex. Bus. & Com. Code § 1.304. However, under Texas law, this duty to act in good faith in a commercial transaction does not create an independent cause of action. Northern Natural Gas Co v. Conoco, Inc., 986 S.W.2d 603, 606 (Tex. 1998); Adolph Coors Co. v. Rodriguez, 780 S.W.2d 477, 482 (Tex. App. 1989). Texas recognizes an independent tort claim for breach of the covenant of good faith and fair dealing only in circumstances in which the parties to a contract are in a special relationship, such as may arise in the insurance context as a result of the parties' unequal bargaining power and nature of insurance contracts. Arnold v. Nat'l County Mut. Fire Ins. Co., 725 S.W.2d 165, 167 (Tex. 1987). Noting the narrow cause of action recognized by the Texas Supreme Court in the insurer-insured relationship, the Texas Court of Appeals has held that "[t]he 'special relationship' cause of action in tort for breach of the duty of good faith and fair dealing, however, does not extend to ordinary commercial contractual relationships such as the supplier-distributor relationship." Adolph Coors, 780 S.W.2d at 481; see also Hionis Int'l Enters. v. Tandy Corp., 867 F. Supp. 268, 273 (D. Del. 1994) (citing Adolph Coors and holding that "[t]he general rule in Texas is that the tort cause of action for breach of the duty of good faith and fair dealing does not apply to ordinary commercial contractual relationships."). There is no evidence, nor do the parties contend, that such a special relationship existed between Michaels and Jem. Indeed, it is apparent that the parties entered into an arms-length commercial relationship. Jem's independent claim for breach of the covenant of good faith and fair dealing fails as a matter of law, and accordingly, summary judgment will be granted for Defendant on Count Two of the Complaint.

---

[4] In its briefing, Jem actually cites section 1.203 of the Texas UCC, but the former section 1.203, relating to the obligation of good faith, was deleted and replaced with a provision concerning whether leases create security interests. The covenant of good faith implied in all agreements governed by the Texas UCC currently exists as codified in section 1.304.

As to Jem's claim that Michaels is estopped from asserting that the purchase orders were cancellable (Count Three), Jem does not point to evidence demonstrating that the parties agreed in writing to modify the Vendor Agreement's cancellation terms. Jem acknowledges, as it must, that the Vendor Agreement contains two cancellation provisions: one providing that a purchase order would automatically be canceled if the product ordered thereunder did not ship within the date parameters set forth on the purchase order and the other giving Michaels the right to cancel a purchase order at any time before shipment of the product. Jem further acknowledges that these provisions govern the transactions between Jem and Michaels unless modified by the parties. According to Jem, however, the record shows that Jem repeatedly stated that it required its purchase orders to be non-cancellable. It argues that, by remaining silent on the matter, Michaels led Jem to believe that the Vendor Agreement had been validly modified. Jem also claims that Pam Merritt of Michaels expressly agreed to this modification in a phone call and that her associate, Candace Lewis, confirmed this agreement in writing, in her May 11 email to O'Rear.

Neither the contracts governing the spinner sales nor Texas law support Jem's position. The Vendor Agreement requires "a written instrument signed by an authorized representative of Michaels and delivered by Michaels to Vendor" to effect a modification of the terms governing purchase orders, including the cancellation terms. Jem proffers two written instruments in which Michaels purportedly assented to modify the Vendor Agreement such that purchase orders issued to Jem would be non-cancellable. One is Merritt's email approving sixty-day payment terms and the other is Lewis's email expressing Michaels' commitment to purchase a quantity of LED spinners. Jem contends that, given that these emails were written in response to Jem's repeated insistence that the purchase orders be non-cancellable, the emails implicitly agreed to modify the terms of the Vendor Agreement accordingly. Jem maintains that, at the very least, this evidence

15

raises a question of fact. The Court disagrees. No reasonable factfinder could determine that these emails, which lack any affirmative assent to non-cancellability, effectively modify the Vendor Agreement. The Vendor Agreement, by its terms, clearly requires express agreement by an authorized Michaels representative for a valid modification. Moreover, under Texas law, a "contract cannot be modified by silence." Fubar, Inc. v. Turner, 944 S.W.2d 64, 67 (Tex. App. 1997). Jem's position is further belied by the Purchase Orders themselves, which clearly state that they will automatically "cancel by" a certain date, in the event product does not ship. Jem's tortured interpretation of the email communications, and indeed of Michaels' overall silence, fails to defeat summary judgment on Count Three of the Complaint.

The Court turns to Count Four of the Complaint, in which Jem seeks to recover almost $6 million in alleged lost sales based on a promissory estoppel theory of relief. Jem argues that after it sent Michaels an offer with a spreadsheet setting forth the total quantity of fidget spinners which Jem could supply, Jem relied on Michaels' "acceptance of the spreadsheet." Jem proceeded to obtain the merchandise based on its expectation, it argues, that Michaels would formally place orders for all the fidget spinners offered by Jem. The Court finds that Plaintiff's promissory estoppel claim fails as a matter of law. While Texas law holds that "promissory estoppel is normally a defensive theory," it does recognize that it may be asserted as an affirmative ground for relief. Medistar Corp. v. Schmidt, 267 S.W.3d 150, 163 (Tex. App. 2008) (collecting cases). The cause of action is "available to a promisee who has acted to his detriment in reasonable reliance on an otherwise unenforceable promise." Hunton v. Guardian Life Ins. Co., 243 F. Supp. 2d 686, 713 (S.D. Tx. 2001). To prevail on a claim of promissory estoppel, a plaintiff must establish the following elements: "(1) a promise, (2) foreseeability of reliance thereon by the promisor, and (3) substantial reliance by the promisee to his detriment."

MetroplexCore LLC v. Parsons Transp., Inc., 743 F.3d 964, 977 (5th Cir. 2014) (quoting English v. Fischer, 660 S.W.2d 521, 524 (Tex. 1983)). Texas courts "have emphasized that estoppel requires a reasonable or justified reliance on the conduct or statement of the person sought to be estopped by the person seeking the benefits of the doctrine." Hartford Fire Ins. Co. v. City of Mont Belvieu, 611 F.3d 289, 297 (5th Cir. 2010). Applying Texas law, the Fifth Circuit has found that the vagueness of a purported promise undermines a party's claim of reasonable reliance. Id. The Hartford Fire court so reasoned based on principles of estoppel and Texas law, pointing to the example set forth by the Texas Court of Appeals in Allied Vista, Inc. v. Holt, 987 S.W.2d 138 (Tex. App. 1999). In that case, the Fifth Circuit observed that although "plaintiff relied on a promise by his former employer to supply him with equipment for a new recycling plant," the promise was "'too vague to support detrimental reliance'" in light of the fact that the "parties never discussed what items of equipment would be forthcoming or what specific terms, such as pricing and payment, would apply." Id. (citing Allied Vista, 987 S.W.2d at 140).

The facts of this case similarly fail to establish, or even raise a disputed issue, that Jem's reliance on Michaels' purported promise to buy all of the offered fidget spinners was either reasonable or justified. First, Jem, a sophisticated party with experience in commercial transactions, was well aware of the governing terms of the Vendor Agreement, which expressly require that sales to Michaels will be consummated through purchase orders, generated through Michaels' EDI system. Second, the communications between Jem and Michaels following Michaels' express commitment to a certain quantity of fidget spinners Jem offered for sale belie Jem's claim that it reasonably expected the full offer to be accepted. After Lewis's email stating that Michaels committed to ordering 610,080 units of the LED spinners, O'Rear inquired about whether Michaels was ordering the remaining units set forth in the spreadsheet sent with the

offer. The Michaels response made it very clear that no additional units were being ordered at that time and that the Michaels buyers lacked authority to place orders for a greater quantity of fidget spinners from Jem. Indeed, O'Rear confirms this understanding that Michaels was not committing to buy more units, even expressing that Jem had acquired the additional quantity in a "risky move on their part." Third, Jem appears to rely on Merritt's statement, "now get me some units," but this statement's indefiniteness as to the essential terms of a purchase, i.e., type of spinner, quantity, shipment window, renders it much too vague to constitute a promise that would foreseeably induce reasonable reliance by Jem. The vagueness is especially at odds with Jem's claims of estoppel in light of the parties' sophistication, Jem's demonstrated knowledge of how orders were placed under the Vendor Agreement, and the overall context of the transactions between Jem and Michaels. In short, viewing the evidence in the light most favorable to Jem, the Court concludes that it fails as a matter of law to establish Jem's claim for promissory estoppel. Accordingly, summary judgment will also be granted to Michaels on Count Four.

Genuine issues of fact, however, preclude the Court from granting either Plaintiff or Defendant summary judgment on the breach of contract claim. Under Texas law, "breach of contract occurs when a party fails to perform an act that it has expressly or impliedly promised to perform." Case Corp v. Hi-Class Bus. Sys. of Am., Inc., 184 SW3d 760, 770 (Tex. App. 2005). On the one hand, the Vendor Agreement plainly gave Michaels the "absolute right to cancel [purchase orders] for any reason before shipment of the goods ordered thereunder," and there is no genuine dispute that none of the spinners ordered from Jem ever shipped. Thus, there is evidence which might allow a reasonable jury to find that Michaels properly exercised its right to cancel the purchase orders before Jem's performance, i.e. shipment of the goods, and thus conclude that Michaels did not breach the contract. On the other hand, the record also contains

evidence that Jem was ready to perform its obligations under the purchase orders (and indeed had a right to do so) but did not ship the spinners at the express request of Michaels due to inventory issues, only to have Michaels avail itself of the deferred shipment and cancel the order. Moreover, there is evidence that the safety hold Michaels communicated to Jem is at odds with an internal email releasing the hold, indicating that the safety compliance issue was a pretextual reason to prevent Jem from shipping its goods. A reasonable jury could find, based on the evidence of record, that Michaels breached the contract by failing to honor the covenant of good faith implied in the contract with Jem.

While Plaintiff may not pursue an independent claim for breach of the covenant of good faith, every contract governed by the Texas UCC imposes an obligation good faith in the performance of the contract. Tex. Bus. & Com. Code § 1.304; La Sara Grain Co. v. First Nat'l Bank, 673 S.W.2d 558, 563 (Tex. 1984) (holding that "an obligation of good faith is imposed on the performance of every contract or duty with the [Texas Uniform Commercial] Code" and citing the § 1.203, the predecessor provision relating to the duty of good faith); see also Adolph Coors, 780 S.W.2d at 480-81 (holding that the "duty of good faith and fair dealing in the performance of a contract presently exists in Texas both under the Uniform Commercial Code . . ., as part of every commercial contract, and also in limited circumstances under common law as the basis of tort liability."). Under Texas law, a failure to exercise good faith in performing a specific duty or obligation under a contract within the purview of the UCC constitutes a breach of the contract. Conoco, 986 S.W.2d at 606. The Texas UCC defines "good faith" as "honesty in fact and the observance of reasonable commercial standards of fair dealing." Tex. Bus. & Com. Code § 1.201(20). "An implied covenant of good faith and fair dealing place duties of good faith,' 'fairness,' 'decency,' and 'reasonableness' upon all parties in regard to actions construing

the contract, and components, terms and conditions of the contract." <u>Case Corp.</u>, 184 S.W.3d at 770 (quoting <u>Tex. Nat'l Bank v. Sandia Mortgage Corp.</u>, 872 F.2d 692, 698-99 (5th Cir. 1989)). The obligation of good faith places an even greater duty on the parties to a contract than the implied duty to cooperate, which, where applicable, prohibits a party to a contract from preventing another party from performing its contractual duties or interfering with its ability to perform. <u>Id.</u>

Viewing the evidence in the light most favorable to Jem, the record could support a finding that Michaels either blocked Jem from performing by the pretext of a safety hold or that it lulled Jem into not exercising its right to ship in fulfillment of the orders just so that Michaels could avoid cancelling the orders unless and until it unilaterally decided it did not want the goods it had purchased. In other words, a reasonable factfinder could determine that Michaels engaged in stalling tactics so that it could acquire the ordered merchandise if it wanted to while also running out the clock on its right to cancel, thus depriving Jem of its right to perform under the purchase orders. These facts give rise to the quintessential "have my cake and eat it too" situation which amounts to a breach of the covenant of good faith.

In short, this case presents a contested issue of fact as to the breach of contract claim: whether Michaels – through pretext or stalling – induced Jem not to perform, i.e., ship the spinners per the purchase orders, with a view toward enabling Michaels to preserve its option to demand delivery if it wanted to or cancel the order because shipment had not been made. The Court is aware that Michaels presents a competing narrative of events, with facts in the record to support its version. However, the Court cannot engage in weighing of evidence and credibility determinations in evaluating a motion for summary judgment.

### III.   CONCLUSION

For the reasons discussed, Michaels has demonstrated that it is entitled to summary judgment on the independent claim for breach of the covenant of good faith and fair dealing (Count Two) and the Complaint's two estoppel claims (Counts Three and Four). However, genuine issues of fact as to the breach of contract claim (Count One) preclude either Plaintiff or Defendant from satisfying the Rule 56(a) burden of obtaining summary judgment on that claim. Thus, Plaintiff's breach of contract claim for recovery of losses related to the 610,080 spinner units that were the subject of purchase orders survives this motion for summary judgment. Plaintiff's motion for summary judgment will accordingly be denied in full, and Defendant's motion will be granted in part and denied in part. An appropriate Order will be filed.


                                              ____s/ Stanley R. Chesler____
                                              STANLEY R. CHESLER
                                              United States District Judge

Dated:  September 12, 2019